# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

STEVEN OLSON,

           Plaintiff,

     v.                                Case No. 12-C-1126

BEMIS COMPANY, INC., et al.,

           Defendants.

---

## ORDER GRANTING DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

---

Plaintiff Steven Olson brought this hybrid action under Section 301 of the Labor Management Relations Act (LMRA), 29 U.S.C. § 185, against former employer Bemis Company, Inc. (Bemis), and the unions that represented his interests while he was employed at Bemis: United Steel, Paper, and Forestry, Rubber, Manufacturing, Energy, Allied-Industrial, and Service Workers International Union (International Union) and its affiliate, Local Union 2-0148 (Local 2-148) (collectively referred to as "the Union"). (Am. Compl., ECF No. 21.) Bemis terminated Olson's employment on February 3, 2012, after finding that he violated a workplace safety rule by manually lifting one end of a 130-pound shaft. Local 2-148 subsequently filed a grievance on Olson's behalf to contest his discharge. Acting without Olson's consent, Local 2-148 settled the grievance with Bemis, entitling Olson to a $20,000 cash payment but not reinstatement. Olson alleges that Bemis breached its collective bargaining agreement by terminating him without just cause and that Local 2-148 and the International Union, acting as an agent of Local 2-148, breached their duty of fair representation in the handling of Olson's discharge grievance and settlement. Bemis and the Union

have separately moved for summary judgment. (ECF Nos. 79 & 83.) For the reasons stated below, the defendants' motions for summary judgment will be granted.

## I. Background

On or about October 11, 2004, Olson began working for Pechiney Plastic Packaging, Inc. ("Pechiney"). Effective March 1, 2010, Bemis purchased Pechiney's assets and took over operations of the plant. (Olson Decl. ¶ 27, ECF No. 100.) Bemis and the Union entered into a collective bargaining agreement (CBA), effective March 1, 2010, through February 28, 2013, which governed their relationship at the time of Olson's discharge. The CBA, by its terms, is an agreement between Bemis and the International Union, with the International Union acting "on behalf of Local 2-0148." (Labor Agreement at 2, ECF No. 100-8.)

Local 2-148 is one of the unions under the umbrella of International Union District 2. At the time of Olson's discharge, District 2 employee Paul Footit served as the staff representative for Local 2-148. Local 2-148 is an amalgamated local union, in that there are four separate bargaining units within Local 2-148, each consisting of the bargaining unit employees at a separate employer. At the time of Olson's discharge, the Bargaining Committee at Bemis consisted of five members: Chairman Chris Haddock, Co-chairman Pamela Boushley, and Committee members Paul Geibel, Rick Jacobson, and Kyle Hipp. Each member of the Bargaining Committee was employed as a full-time bargaining unit employee at Bemis and was paid no more than $1,200 per year for his or her service on the committee. Haddock served as the Chief Steward for Local 2-148 at Bemis. (Haddock Decl. ¶¶ 1–3, 5, ECF No. 86.)

The CBA provided a multi-step grievance process for Bemis and the Union to resolve any issues or disputes related to the CBA, including disciplinary and termination decisions. (ECF No. 100-8 at 3.) Section XXX, entitled Adjustment of Complaints, provided that "[t]he local union shall select a Standing Adjustment Committee [or Bargaining Committee] which shall present the issues that may arise to the appointed representatives of the Company. The Standing Adjustment Committee shall represent the signatory Union as the bargaining agency." (*Id.* § XXX(B).) Section XXX(C) describes the four-step process for resolving grievances:

> 1. Between the aggrieved employee, one member of the [Bargaining] Committee, and the Supervisor, or at the option of the aggrieved employee, between themselves and the Supervisor. It is understood, however, that the Union may have a member of the [Bargaining] Committee present. Any grievance shall be presented to [Bemis] not later than ten (10) working days after the aggrieved employee or Union knew of the action giving cause to the grievance. If not presented within such time, the grievance shall be deemed to have been waived.
>
> 2. If no satisfactory settlement is made within three (3) days, the aggrieved employee will refer the question to the Union [Bargaining] Committee, who will reduce the grievance to writing and present it to a representative of the Human Resources Department and the Manager of Operations. If no satisfactory settlement is made within five (5) days, it shall be referred to the Plant Manager.
>
> 3. ["Step 3"] If no settlement is reached within ten (10) days the grievance will be appealed to the Manager, Labor Relations through notification to the Plant Manager.
>
> 4. ["Step 4"] In the event that no settlement is reached within ten (10) days, it shall be referred to arbitration. . . .
>
> 5. Each party shall bear the expenses of their representatives and witnesses. The fees and expenses of the arbitrator shall be borne equally by the Parties.
>
> . . . .

Section XXX also contains subsection (D), which describes specific procedures for a discharge grievance:

If a discharged employee claims injustice, the grievance shall be presented within forty-eight (48) hours . . . to the Plant Manager. If it be proven that the discharge was unjust and that any other disciplinary action would be unjust, the employee shall then be reinstated with full seniority and be paid for time lost. In all cases of discharge, the parties shall meet promptly at the third and fourth stages (if necessary) in an attempt to resolve the grievance short of arbitration. Should the Union decide to process the discharge to arbitration, the Union will notify the company of such within ten working days following the next regularly scheduled membership meeting of Local #2-0148, after receiving [Bemis'] fourth stage answer.

. . . .

The incident that led to Olson's termination occurred on January 5, 2012, although a previous incident is also relevant to this action. Bemis trains its employees in Task Safety Analysis (TSAs) in an effort to prevent workplace injuries. (Haddock Decl. ¶ 4, ECF No. 86.) On March 13, 2011, Olson violated a TSA when he was working with a helper on the "9 Blown Extruder" machine. Olson placed a rope loop over his wrist, which violated a TSA prohibiting employees from tying a rope around a body part. Olson's helper mistakenly thought he had signaled to start a winder, and when the helper prematurely started the machine, Olson was dragged toward the machine. Fortunately for Olson, the machine stopped when the film broke and no injury or damage resulted. Olson self-reported the incident and was suspended for one day and lost twelve hours of pay. (Olson Decl. ¶ 28, ECF No. 100.) Local 2-148 grieved the suspension, and although the suspension was not removed from Olson's record, the Union reached a settlement agreement with Bemis under which Olson could earn back the lost pay by talking to other employees about the importance of workplace safety. (Haddock Decl. ¶ 16, ECF No. 86.)

The incident that led to Olson's discharge occurred on January 5, 2012. Olson states that he was undergoing training to operate the "11 Blown Film Extruder" machine. The machine he was

operating was in the process of a "make ready," which is when a machine is changed to produce a different product. Olson describes the scene as follows:

> Nothing was prepared. It was a chaotic situation and described as mayhem. There were people all over the place. A 130-pound shaft needed to be removed from the winder cart. The quicker this could be done the less product waste would be created. Minimizing product waste was conveyed to me and others by Bemis as important. To that end, I lifted one end of the shaft to place a lifting strap around it, and another employee, Michael Klawitter, lifted the other end. The shaft was manually removed from the cart in the mix of the chaos. Soon thereafter, I felt a pull in [my] back and began to experience a numb sensation that radiated into my left leg. Because my condition worsened to include heart-related symptoms, an ambulance was called and I was transported to the local emergency room for treatment.

(Olson Decl. ¶ 29, ECF No. 100.) Later in the day, Olson completed an Injured Employee Statement Form. (ECF No. 100-3.) On the form, Olson stated that "[w]hile changing shafts from 6" to 3" one 6" shaft was on the winder kart [sic] and needed to be removed." He further explained that he "lifted the one end of the 6" shaft to be able to get the lifting strap under it. At that point [he] felt a pull in [his] lower back." He stated that the cause of the accident was "lifting the 6" shaft, and when asked to indicate whether anyone witnessed the incident, he responded, "No-one really seen it happen that I know."

TSA Film 16, entitled "Changing Shafts" provides that employees should change shafts using a belly band (a.k.a. "lifting strap") and a hoist rather than manually lifting the shafts. (ECF No. 100-25.) The shaft extracting machinery can position the shaft so that lifting straps can be placed under it without any manual lifting. (Haddock Decl. ¶ 9, ECF No. 86.) Following notice of Olson's workplace injury, Bemis management conducted an investigation into the January 5 incident. Steven Hitte, Olson's supervisor, completed an Incident Investigation Report, which stated that "[Olson] was lifting one end of a 6" shaft off of the winder cart to get the strap under it.

[Olson] felt pain in lower back." (ECF No. 100-4.) After interviewing several employees, Bemis' management staff interviewed Olson on January 12. In this interview, Olson admitted that he knew there was a TSA for changing shafts. When asked if he knowingly violated a TSA for the second time, Olson responded, "Guess you could say so." He stated that he "had an issue" with TSA Film 16 because it "[t]akes too long and generates waste." He further stated as a general matter that he believes in TSAs but no one follows them because they create waste. Commenting on the "mayhem" he experienced January 5, Olson stated, "We all know the TSA requires straps. But how do you get it done and stay in waste codes? If you do by TSA, can't make waste." Olson also reported that Mike Klawitter assisted him in lifting the shaft and placing it on a cart. (ECF No. 100-6 at 1.)

On or about January 17, Bemis conducted a second round of interviews with employees who were working in the same department as Olson on January 5, including Michael Klawitter. According to the meeting notes, Klawitter stated that he never saw Olson change a shaft. (ECF No. 86-4; Haddock Decl. ¶ 18, ECF No. 86.) Bemis then interviewed Olson again on January 27. (Olson Decl. ¶ 31, ECF No. 100.)

On February 3, 2012, Bemis Production Manager Andy Irvine issued Olson a letter of termination. (ECF No. 86-2.) In the letter, Irvine recounted that Olson had been disciplined in March 2011 for failing to follow a TSA and had been warned that "failure to follow TSAs in the future would lead to further disciplinary action, up to and including termination." He summarized the incident, noting that according to Olson's statement after the incident, Olson had attempted to lift a shaft alone. Irvine indicated that Olson had been certified on TSA Film 16 just five weeks prior to the January 5 incident, and he noted Olson's admission that he was aware of the TSA on

January 5. Irvine stated, "[t]his is your second incident of knowingly violating high risk TSAs in the last year." Irvine then noted that Olson delayed three hours in reporting the incident after it occurred and also changed his story at the January 12 meeting by involving Klawitter. He observed that upon interviewing other employees, no one recalled helping Olson move any shafts. Summarizing his conclusions, Irvine found Olson's justifications for knowingly violating TSAs "[m]ost concerning," and he stated that Olson's delay and conflicting reports indicated "indifference for safety policy and corrective action to mitigate damages."

On February 5, 2012, Local 2-148 steward Debra Parker filed a grievance protesting Olson's discharge. (ECF No. 86-3.) The grievance was for "unjust termination" and requested that Olson be given his job back and be made whole with back pay. Haddock commenced an investigation and spoke to Olson about the incident. According to Haddock, Olson did not deny that he manually lifted one end of a 130-pound shaft, and he also stated that TSAs were stupid because no one followed them and that he should be permitted to violate TSAs to prevent waste at his machine. (Haddock Decl. ¶ 19.) Before Local 2-148's investigation was completed, the Step 3 grievance meeting was held. (Haddock Decl. ¶ 21.) At the Step 3 meeting with Plant Manager Rob Weklar on February 9, 2012, the Bargaining Committee advanced a number of arguments on Olson's behalf. According to the notes of Pamela Boushley, the Committee argued that other employees had lifted shafts in the past but were not disciplined and that other employees may have violated TSAs on January 5. Boushley also noted that if two people lifted a shift, although not in conformance with the TSA, Weklar could accept that action as long as it was done safely. (ECF No. 100-11 at 3.) Notwithstanding these arguments, Weklar denied Olson's grievance at Step 3. (Haddock Decl. ¶ 22.)

At the Step 4 meeting on March 5, 2012, the Bargaining Committee again advanced arguments on Olson's behalf.  According to Boushley's notes, the Committee argued that TSAs were a work in progress and inconsistently enforced, Olson was still in training on the machine, Olson was a 7/8 year employee at the plant, and other employees were shocked that Olson had been terminated.  (ECF No. 100-14 at 2–3.)  The Committee asked Bemis to modify the discharge to a long suspension.  (Haddock Decl. ¶ 24, ECF No. 86.)  Bemis denied the grievance on March 5, and on March 8, Group Human Resources Director Angela Creel issued a memorandum to the Bargaining Committee explaining Bemis' decision as follows:

> In January 2012 [Olson] violated a safe work procedure, as well as a plant safety rule, by incorrectly attempting to lift a 130 pound "shaft" by himself.  Through the investigation of this incident, and in conjunction with multiple discussion with Mr. Olson, as well as statements from other employees, it is clear that he knew and understood the proper safe work procedure and the expectation for this task.  He does not dispute that he violated the work procedures.  Despite repeated warnings, including a disciplinary suspension for failing to follow safe work procedures, opportunities to improve his safety performance and his demonstrated refusal to follow safe work procedures, Mr. Olson continues to disregard his safety and the safety of others.  As this is not Mr. Olson's first incident in willfully violating stated safety expectations, his termination is proper and just.

(ECF No. 100-15.)

On or about March 20, 2012, Haddock received a letter from Attorney Peter Culp stating that he had been retained to represent Olson on his termination.  Haddock contacted International Union staff representative Paul Footit to ask how to correspond with Olson given that he was now represented by independent counsel.  (Haddock Decl. ¶ 30, ECF No. 86.)  On March 20, Haddock hand-delivered to Olson a letter dated March 19 informing him that the Bargaining Committee decided not to advance his grievance to arbitration.  (ECF No. 100-16.)  The letter also informed Olson that if he would like to plead his case to the Local 2-148 membership, he could attend the

union meeting on Wednesday, March 24th at 7:00 p.m. The "24th" was crossed out in pen and replaced with "21st," which was the correct date of the meeting. Haddock also hand-delivered a separate letter to Culp on March 20 which erroneously stated that the union meeting would be held on March 22. (ECF No. 86-7.) The letter stated that at the union meeting, "Brother Olsen [sic] and the [Bargaining Committee] will present their views of his grievance, and the membership will vote on whether to arbitrate the grievance or not." Haddock also signed and sent a separate letter to Culp explaining that Culp should not contact Haddock or the Bargaining Committee with regard to Olson's case and that Culp should instead correspond only with Emma Rebhorn, International Union assistant general counsel. (ECF No. 86-8.)

Olson appeared at the March 21 meeting and pled his case to the union membership that his grievance should proceed to arbitration. According to the minutes, Haddock explained why the Bargaining Committee had decided not to advance the grievance to arbitration. Olson volunteered to pay half the cost of arbitration, and the membership ultimately voted 19 to 14 in favor of arbitration. The meeting notes concluded that the "[Bargaining] Committee will be taking this case to arbitration." (ECF No. 100-17.) Haddock called Olson on March 26, 2012, to confirm that Olson would be responsible for paying his attorney while Local 2-148 would cover the arbitrator's fees, transcript fees, and witness costs. This conversation was confirmed by letter dated March 27, 2012. (ECF No. 100-18.) Haddock also informed Bemis that Olson's grievance would be arbitrated and that Olson would be represented by private counsel. (ECF Nos. 100-19 & 100-20.)

Haddock and Bemis subsequently engaged in settlement discussions concerning Olson's grievance. Bemis' initial offer was to reinstate Olson on a "last chance" basis, conditioned upon Olson becoming healthy enough to resume work, following safety rules and TSAs, successfully

completing safety trainings, achieving TSA re-certification, and achieving certification as a Blown Film Operator. (ECF No. 86-11.) Haddock advocated this offer to Olson, but Olson declined it. (Olson Decl. ¶ 38, ECF No. 100.) Bemis also offered to settle the grievance for $10,000 without the possibility of reinstatement. (Haddock Decl. ¶ 39, ECF No. 86.) Olson declined this offer as well. (Olson Decl. ¶ 39, ECF No. 100.) Bemis' third and final settlement offer was for $20,000, again without the possibility of reinstatement. The offer was set to expire on May 8, 2012. (*Id.* ¶ 41.) Haddock presented this offer to Olson at his home, but Olson stated that he would first need to speak with his attorney before making a decision. (*Id.*) In late April 2012, Olson, with the assistance of Attorney Culp, made a counteroffer for $37,500 plus health insurance coverage for the remainder of 2012 and other terms and conditions. (ECF No. 99-15.) On April 30, 2012, Bemis rejected the counteroffer and indicated that it would arbitrate the case if Olson did not accept either its offer of "last chance" reinstatement or $20,000. (ECF No. 100-21.)

On May 7, 2012, with the $20,000 offer set to expire a day later, Haddock and Boushley went to Olson's home to inform him that the Bargaining Committee was going to accept the $20,000 settlement offer. They presented Olson with a copy of the settlement agreement but he refused to sign it. Later that day, Haddock notified Bemis that Local 2-148 was accepting Bemis's offer to settle the grievance for $20,000 over Olson's objection. Bemis subsequently sent Olson a $20,000 check. (Haddock Decl. ¶ 48, ECF No. 86.)

In the meantime, Olson was still off work due to the January 5, 2012 injury. On May 29, 2012, Olson underwent an independent medical evaluation (IME) with Dr. Richard Karr. (ECF No. 100-24.) Dr. Karr opined that Olson "at most sustained a workplace low back strain on 1/5/12, which only ***temporarily*** aggravated a pre-existing personal thoracolumbar condition, without

causing any structural spinal or neurological injuries. (*Id.* at 2 (emphasis original)). Dr. Karr further stated that "Mr. Olson fully recovered from the 1/5/12 low back strain no later than 4/5/12 (three months post-incident), with 0% PPD [Permanent Partial Disability] and no alteration in working capability." (*Id.*) Olson testified that he believes he should have been treated for the injury for two additional months after the IME and that he could have returned to work in June 2012 with a lifting restriction. Olson starting seeking other employment in September 2012. (Olson Dep. at 13:22–15:9, ECF No. 106-6.)

## II. Summary Judgment Methodology

Summary judgment is proper if the pleadings, depositions, answers to interrogatories, and admissions on file, together with any affidavits, show that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). "An affidavit or declaration used to support or oppose a motion must be based on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4); *see also Visser v. Packer Eng'g Assocs, Inc.*, 924 F.2d 655, 659 (7th Cir. 1991) (observing that "personal knowledge" may include factual inferences and opinions, so long as the inferences and opinions are "grounded in observation or other first-hand personal experience. They must not be flights of fancy, speculations, hunches, intuitions, or rumors about matters remote from that experience."). "Material" means that the factual dispute must be outcome-determinative under law. *Contreras v. City of Chicago,* 119 F.3d 1286, 1291 (7th Cir. 1997). A "genuine" issue must have specific and sufficient evidence that, were

a jury to believe it, would support a verdict in the non-moving party's favor.  Fed. R. Civ. P. 56(e);

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

The moving party has the burden of showing there are no facts to support the nonmoving party's claim.  *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986).  In determining whether summary judgment is proper, a court must construe the evidence in the light most favorable to the non-moving party.  *Ramos v. City of Chicago,* 716 F.3d 1013, 1014 (7th Cir. 2013). There is no genuine issue of material fact, and therefore no reason to go to trial, when no reasonable jury could find in the non-moving party's favor.  *Smith v. Lafayette Bank & Trust Co.,* 674 F.3d 655, 657 (7th Cir. 2012).

### III. Analysis

Unions have broad authority to act as the exclusive bargaining agent for a class of employees.  *Garcia v. Zenith Electronics Corp.*, 58 F.3d 1171, 1175 (7th Cir. 1995).  This broad authority "stems from the employees' choice to exercise their right to self organization."  *Id.* Employees are able to achieve better conditions of employment by pooling their economic strength and acting as a collective.  *Id.*  The benefits to this collective action are legion, but the inherent trade-off is that "[t]he interests of individual employees sometimes may be compromised for the sake of the larger bargaining unit."  *Id.* at 1176.  In individual grievance proceedings, "the union's own credibility, its integrity as a bargaining agent and the interests of all its members may be at stake."  *Id.*  Therefore, a union may consider the interests of all employees before deciding whether to press the grievance of one employee, and it may make strategic decisions according to its evaluation of the merits of the grievance.  *Id.*

This broad authority is limited by a union's duty to represent each of its members fairly. "Although national labor policy strongly favors private over judicial resolution of disputes arising under a CBA, [Section] 301 of the LMRA allows a union member to seek relief in federal court when his union breaches its duty to represent him fairly." *See Truhlar v. U.S. Postal Serv.*, 600 F.3d 888, 891 (7th Cir. 2010) (citing *Republic Steel Corp. v. Maddox,* 379 U.S. 650, 652–53 (1965) and *DelCostello v. Int'l Bhd. of Teamsters*, 462 U.S. 151, 164 (1983)). A union breaches its duty of fair representation if its conduct is arbitrary, discriminatory, or in bad faith. *Vaca v. Sipes,* 386 U.S. 171, 190 (1967). "The idea behind [Section] 301 is that a union member should have judicial recourse if, during the arbitration process, his union completely bungles (or intentionally sabotages) an otherwise meritorious grievance." *Truhlar*, 600 F.3d at 891–92 (citing *Bell v. DaimlerChrysler Corp.*, 547 F.3d 796, 804 (7th Cir. 2008)). In a hybrid action against a union and an employer, the plaintiff's claims are "inextricably interdependent," meaning that in order to recover against either defendant, the plaintiff must show that the union breached its duty of fair representation and that the employer violated the CBA. *DelCostello*, 462 U.S. at 164–65.

**A. Arbitrary Conduct**

Olson primarily argues that the Union's handling of his grievance was arbitrary. The arbitrariness analysis "requires inquiry into the objective adequacy of union activity." *Trnka v. Local Union No. 688, United Auto., Aerospace & Agric. Implement Workers of Am.*, 30 F.3d 60, 63 (7th Cir. 1994). A union's conduct is arbitrary if it ignores a meritorious grievance or processes a grievance in a perfunctory manner. *Vaca*, 386 U.S. at 191. This Court's review is highly deferential to the Union: "a union's actions are arbitrary only if, in light of the factual and legal landscape at the time of the union's actions, the union's behavior is so far outside a 'wide range of

reasonableness' as to be irrational." *Air Line Pilots Ass'n, Int'l v. O'Neill*, 499 U.S. 65, 67 (1991) (internal quotation omitted); *see also Trnka*, 30 F.3d at 61 (explaining that a union's decision to drop its support of a grievance is arbitrary only if no colorable argument could be made to support the union's decision at the time it was made); *Ooley v. Schwitzer Div., Household Mfg. Inc.,* 961 F.2d 1293, 1302 (7th Cir. 1992) ("[C]ourts should not substitute their judgment for that of the union, even if, with the benefit of hindsight, it appears that the union could have made a better call.") (internal quotation omitted). In addition to demonstrating arbitrary conduct, the plaintiff must show that he was actually harmed by the Union's actions and that the outcome of the grievance process "would probably have been different but for the union's activities." *Garcia*, 58 F.3d at 1176–77.

**1. The Local Union Had Authority to Settle the Grievance Without Olson's Consent.**

Olson first makes the somewhat astounding argument that Local 2-148 had no authority under the CBA to settle the grievance short of arbitration absent his consent regardless of whether it exercised good faith in doing so. His argument rests on Section XXX(C)(4) of the CBA, which states: "In the event that no settlement is reached within ten (10) days, [the grievance] *shall* be referred to arbitration." (emphasis added). Olson reads this language to mean that Local 2-148 had ten days after the failure to resolve the grievance with the Plant Manager to either settle the grievance or proceed to arbitration. In his view, the CBA made a request for arbitration on the part of Local 2-148 "a ministerial act" once a settlement satisfactory to the grievant was not achieved at Step 3 of the process. (Br. in Opp. at 17–18, ECF No. 96.) He contends: "There is no avoiding the conclusion that the Unions were obligated to arbitrate Mr. Olson's grievance–meritorious or not–once the settlement period expired." (*Id.*)

Olson's interpretation of the CBA is untenable. There is nothing in the CBA that suggests that Local 2-148 is required to take every grievance to arbitration. Indeed, the Union's right not to seek arbitration is implicit in the CBA. For grievances involving discharge it is also explicit. Section XXX(D) states:

> In all cases of discharge, the parties shall meet promptly at the third and fourth stages (if necessary) in an attempt to resolve the grievance short of arbitration. *Should the Union decide to process the discharge to arbitration*, the Union will notify the company of such within ten working days following the next regularly scheduled membership meeting of Local #2-0148, after receiving [Bemis'] fourth stage answer.

(ECF No. 100-8 at 4.) (italics added). The clear import of the italicized language is that Local 2-148 has discretion under the CBA to decide whether to pursue a grievance over a discharge to arbitration.

Nor was Local 2-148's right to settle the grievance extinguished once it was referred to arbitration. It is implicit in the very nature of a grievance procedure, like any dispute resolution mechanism, that the process can be cut short if the parties later reach an agreement on the matter or either elects to abandon its claim or defense. Nothing in the language of the CBA suggests that initiating arbitration meant arbitration alone could resolve their dispute.

The CBA also did not require the Bargaining Committee to honor Olson's wishes in the settlement process. The plain language of the CBA conferred the authority to pursue and settle grievances on the Union. This is consistent with the well-established principle that employee grievances under a CBA belong to the union and not to the aggrieved employee. *See Vaca*, 386 U.S. at 191–92 ("If the individual employee could compel arbitration of his grievance regardless of its merit, the settlement machinery provided by the contract would be substantially undermined . . . .

[W]e conclude that a union does not breach its duty of fair representation, and thereby open up a suit by the employee for breach of contract, merely because it settled the grievance short of arbitration."); *Shores v. Peabody Coal Co.*, 831 F.2d 1382, 1383–84 (7th Cir. 1987) (holding that absent a showing of fraud, deceit, or breach of fair representation by union, employees had no standing to challenge arbitration award because unlike the union and the employer, they were not parties to the CBA). Unless the Union had explicitly made such a promise, federal law would not require them to consult with Olson. *See Matthews v. Milwaukee Area Local Postal Workers Union*, 495 F.3d 438, 442 (7th Cir. 2007) (holding that union did not act arbitrarily by settling employee's grievance short of arbitration); *Cleveland v. Porca Co.*, 38 F.3d 289, 296 (7th Cir. 1994) (holding that union had authority to settle dispute even after arbitration award had been entered because award was ambiguous). Olson's argument that the Union acted arbitrarily simply by settling the grievance without his consent is therefore rejected.

### 2. The Local 2-148 Membership Vote Did Not Strip the Local Union of Its Authority to Settle Olson's Grievance Short of Arbitration

Olson next argues that the Union acted arbitrarily by settling his grievance after the Local 2-148 membership voted on March 21 to take his grievance to arbitration. Haddock testified that since 1937, it had been a practice of Local 2-148 to have the membership vote on whether a grievance should proceed to arbitration. (Haddock Dep. at 68:14-23, ECF No. 99-1.) Olson has also submitted an affidavit from Scott Hermes, a former Pechiney and Bemis employee who utilized similar grievance procedures available under previous CBAs. Hermes' employment was terminated on November 17, 2004, and Local 2-148 filed a grievance on his behalf. Hermes contends that the Bargaining Committee did not believe he could prevail on his grievance at arbitration, but like

Olson, after his grievance was denied at Steps 3 and 4, he was able to persuade the Local 2-148 membership to vote in favor of arbitration. Hermes' grievance was arbitrated and he prevailed at arbitration. (Hermes Decl. ¶ 6, ECF No. 98.) The arbitrator sustained the grievance but reduced the discharge to a four-month suspension and awarded back pay and benefits. (ECF No. 98-2 at 14.) Hermes was again terminated on March 20, 2008. Local 2-148 filed a grievance on Hermes' behalf, and after his grievance was denied at Steps 3 and 4, Local 2-148 decided to advance the grievance to arbitration. Attorney Culp also represented Hermes and participated in settlement negotiations with Haddock and Weklar. Ultimately, Hermes contends that he was able to reach a settlement with Weklar that resolved the pending arbitration. He asserts that Haddock never informed him that the Union had any right to settle his grievance without his consent and that if he did not agree to the settlement, the grievance would have continued to arbitration and decision. (Hermes Decl. ¶ 8, ECF No. 98.) Olson suggests this history shows that the Bargaining Committee had no authority to settle his grievance without his consent.

In labor law, a past practice is generally afforded less weight than a written agreement between the parties. *See Chicago Web Printing Pressmen's Union, No. 7 v. Chicago Newspaper Publishers' Ass'n*, 772 F.2d 384, 387 (7th Cir. 1985) (explaining that parties should not "be bound by their customs to the same extent as by explicitly negotiated provisions in their collective bargaining agreement."). One justification for this rule is that management must have the authority to adopt a new practice if the underlying basis for the established practice has changed. *Id.* at 387–88. Nonetheless, a union's failure to follow a well-established practice could conceivably constitute evidence of arbitrariness. *See Cleveland v. Porca Co.*, 38 F.3d 289, 295–96 (7th Cir. 1994) (examining whether a union's promise to hold a membership vote was established by past

practice or union by-laws). Here, there is evidence that Local 2-148 had an established practice of permitting the membership to overturn the Bargaining Committee's decision not to arbitrate a grievance. Haddock testified that he was aware of such a practice, and in addition to the Hermes grievance, Haddock noted that the Union membership had successfully voted to take a grievance to arbitration involving a severance and successorship issue. (Haddock Dep. at 70:18-71:1, ECF No. 99-1.)

Haddock also asserts, however, that the established practice did not strip the Union of its ownership of the grievance or prevent the Union from settling the grievance short of arbitration. He contends that the practice gave Local 2-148 membership one opportunity to rescue a grievance that would otherwise have been abandoned entirely. (Haddock Decl. ¶ 35, ECF No. 86.) To avoid interference with union self-government, courts afford deference to a union's interpretation of its own internal rules. *See Transp. Workers Union of Am., AFL-CIO v. Transp. Workers Union of Am., AFL-CIO, Int'l Union*, 732 F.3d 832, 835 (7th Cir. 2013); *United Bhd. of Carpenters & Joiners of Am., Lathers Local 42-L v. United Bhd. of Carpenters & Joiners of Am.*, 73 F.3d 958, 961 (9th Cir. 1996) ("[A] union's interpretation of its own rules, regulations, and constitution is entitled to a high degree of deference."). A plaintiff must typically show that the Union's interpretation of its own rule was "unreasonable, perhaps even 'patently unreasonable'" before it can be set aside. *Transp. Workers Union of Am.*, 732 F.3d at 835 (internal quotation omitted). Olson claims Hermes' testimony demonstrates that the membership vote actually gave the aggrieved employee the authority to reject the employer's settlement proposals and compel arbitration. But that is not what the history shows. The practice Olson cites was that Local 2-148 membership could override the Bargaining Committee's decision not to seek arbitration. That practice was followed here. After

the membership voted to pursue the grievance, the Bargaining Committee requested arbitration. Olson cites no prior history that supports his contention that once the membership voted to pursue arbitration, the Bargaining Committee lost the authority to settle the grievance short of arbitration.

In short, the one example Olson offers is insufficient to demonstrate that the Union's interpretation of its own rule is unreasonable, much less patently unreasonable. Hermes has not testified that the Union promised not to accept a settlement offer over his objection. Instead, he has testified to his own understanding of Local 2-148's authority, as it applies to a hypothetical situation that he did not encounter. This evidence does not place in doubt the Union's interpretation, which accords with well-established principles that the Union acts as the employee's bargaining agent and owns the employee's grievance. Therefore, a reasonable jury could not find that Local 2-148's decision to settle the grievance following the membership vote in favor of arbitration, by itself, constitutes evidence of arbitrary action.

### 3. The Local Union's Initial Decision to Forego Arbitration Was Not Arbitrary

Olson also contends that the Bargaining Committee's initial evaluation of the merits of his grievance on or around March 19, 2012, is also evidence of the arbitrary manner in which they addressed it. Olson notes that Local 2-148 filed a grievance on his behalf and that at Steps 3 and 4 of the grievance process, as recounted above, the Bargaining Committee argued that his termination was unjust. He contends that the Bargaining Committee's decision to abandon the grievance after Step 4 was a drastic change in position and that no new evidence justified this 180-degree turn.

The mere fact that the Bargaining Committee changed its position, however, is not evidence of arbitrary action. As Haddock explains, the Bargaining Committee may take certain steps to

preserve a member's rights, such as filing an initial grievance, and this does not compel any additional actions. (Haddock Decl. ¶ 17, ECF No. 86.) A union may also determine that a grievance contains some merit but not enough merit to warrant arbitration. *See Thompson v. Aluminum Co. of Am.*, 276 F.3d 651, 658 (4th Cir. 2002) ("An employee has no absolute right to insist that his grievance be taken to a certain level; a 'union may screen grievances and press only those that it concludes will justify the expense and time involved in terms of benefitting the membership at large.'") (internal quotation omitted); *Garcia*, 58 F.3d at 1176 (noting that a union is entitled to make strategic decisions depending on its assessment of the merits).

Here, Haddock asserts that the Bargaining Committee reassessed the merit of Olson's grievance after Steps 3 and 4, and in doing so, determined that Olson's claim lacked sufficient merit to proceed to arbitration. He states that the Committee considered Olson's Injured Employee Statement, Bemis' interview notes, Olson's prior suspension for a safety violation, and his attitude regarding TSAs. He also asserts that the Bargaining Committee considered whether Olson was the victim of disparate treatment but did not have evidence to show that Klawitter or any other employee lifted the shaft with Olson. (Haddock Decl. ¶¶ 23, 26–28, ECF No. 86.)

Olson contends the Committee failed to consider evidence that Bemis permitted an employee to lift a shaft with the assistance of another employee and that Olson received such assistance from Klawitter on January 5. There is a disputed issue of fact as to whether Bemis permitted two employees to jointly lift a shaft. Haddock contends that Bemis had a rule prohibiting any individual from lifting more than 50 pounds. Under such a restriction, he argues that two people would not be allowed to lift 130 pounds manually. Consequently, he contends that Olson was violating a TSA even if he was lifting the shaft with another person. (Haddock Decl. ¶¶ 8, 12,

ECF No. 86.) Olson argues that this rule applies only to individuals and that Plant Manager Robert Weklar approved of two employees jointly lifting a shaft. When Olson's counsel asked Weklar whether two employees were permitted to lift a shaft together, Weklar responded, "I believe that's what the TSA specifies, yes." (Weklar Dep. at 19:1-19, ECF No. 99-9.) However, when cross-examined by the Union's counsel, Weklar testified that he did not believe Bemis had "any specific policy that describes whether two people can lift a certain amount of weight or not." (Weklar Dep. at 55:15-17, ECF No. 106-4.) As a result of Weklar's somewhat inconsistent testimony, it is unclear whether Bemis prohibited two employees from jointly lifting a shaft at the time of Olson's incident.

This disputed issue of fact might be significant in an arbitrator's "just cause" analysis, but only if the arbitrator first found Olson's version of events to be credible. Aside from Olson's testimony, however, there is scant evidence that Olson lifted the shaft with another person. In the Injured Employee Statement, Olson did not mention that anyone else had lifted the shaft with him, and he stated that no one witnessed the incident. (ECF No. 86-1.) After Olson later stated that Klawitter lifted the shaft with him, Bemis' employee interviews failed to substantiate his version of events. (ECF No. 86-4.) Bemis explicitly noted in Olson's termination letter that no employee interviewed could recall helping Olson move a shaft. (ECF No. 86-2.) Klawitter also maintains that he did not lift any shifts and did not observe anyone lifting shafts on January 5. (Klawitter Dep. at 10:16-18, ECF No. 87-4.) Olson claims Haddock testified that one person would not be able to lift a 130-pound shaft, but this testimony is not in the record. The only evidence in the record is Haddock's declaration that it is physically possible for one person to lift one side of the shaft while the other side of the shaft rests on the cart. (Haddock Supp. Decl. ¶ 3, ECF No. 105.) This is consistent with Olson's description of the incident in the Injured Employee Statement, in which

Olson stated that he "lifted the one end of the six inch shaft to be able to get the lifting strap under it." (*Id.* ¶ 4; ECF No. 86-1.) Haddock also stated that it is physically possible for one person to transfer a shaft from one cart to another by lifting one side and moving it and then repeating the operation at the other end of the shaft. (*Id.* ¶ 3.) Thus, the only evidence in the record supporting Olson's version of events is his own testimony, and this testimony appears to contradict his account in the Injured Employee Statement. An arbitrator might have believed Olson's testimony, but the Committee's finding that the evidence failed to substantiate Olson's version of events was not arbitrary.

Olson also contends that the Union's handling of Olson's grievance was arbitrary because their investigation lacked diligence. He first notes that the Bargaining Committee relied on Bemis' interviews rather than conducting its own interviews. He suggests that, had the Committee interviewed Klawitter, it might have discovered that he actually helped Olson lift the shaft, or it might have found cause to question his credibility. Olson also argues that the Committee should have further investigated a rumor that another employee named Kirkwood had lifted a shaft by herself but was not disciplined. (*See* Boushley Dep. at 24:4-21, ECF No. 99-7.)

A union must conduct some "minimal investigation" into a member's grievance, but "only an investigation that reflects 'an egregious disregard for union members' rights constitutes a breach of the union's duty.'" *Truhlar v. U.S. Postal Serv.*, 600 F.3d 888, 893 (7th Cir. 2010) (quoting *Garcia*, 58 F.3d at 1176). "What is required to be shown goes considerably beyond the requirements of a malpractice suit." *Garcia*, 58 F.3d at 1176; *see also United Steelworkers of Am., AFL-CIO-CLC v. Rawson*, 495 U.S. 362, 373 (1990) (holding that "mere negligence" does not state a claim for breach of the duty of fair representation). It was not irrational or even unreasonable for

the Committee to rely on Bemis' interviews. *See Truhlar*, 600 F.3d at 893 (finding that union made rational decision to withdraw grievance based on review of employer's investigative memorandum). Bemis interviewed Klawitter and others who were working in the same department on January 5, but none substantiated Olson's claims about Klawitter. The Committee's failure to interview Klawitter separately also did not harm Olson because Klawitter continues to maintain that he did not help Olson lift a shaft. It is pure speculation that a second interview would have uncovered useful information. Similarly, the Committee's failure to investigate a rumor about another employee who may have lifted a shaft by herself would at most constitute negligence. Union officials conducting investigations cannot be held to the same standards as lawyers conducting discovery. *See Buford v. Runyon*, 160 F.3d 1199, 1203 (8th Cir. 1998) ("We have cautioned in the past that union representatives are not lawyers, and a case claiming breach of the duty of fair representation is not the same thing as a legal malpractice case or a post-conviction petition claiming ineffective assistance of counsel."). The Committee reviewed Olson's Injured Employee Statement and Bemis' interview notes, and Haddock also spoke with Olson personally. Under the deferential standards afforded to union investigations, no reasonable jury could find that the Committee's investigation reflected "an egregious disregard" for Olson's rights. *Truhlar*, 600 F.3d at 893.

Olson additionally argues that the Committee's handling of his grievance was perfunctory because it failed keep Olson informed of the status of his grievance. Olson cites the opinions of Paul Footit, who testified that it would be "best practice" for the Committee to keep the grievant informed as to the results of its investigation, and Committee member Paul Geibel, who also agreed that one of the duties of the Bargaining Committee is to keep the grievant informed of the status of

his grievance when new information arises. (Footit Dep. at 41:2-16, ECF No. 99-3; Geibel Dep. at 101:4-10, ECF No. 99-6.) Committee member Rick Jacobsen testified that as Chairperson, Haddock would be responsible for communicating with the grievant, and Haddock testified that he did not pass along to Olson or Culp the answers he received from Bemis at Steps one through four of the process or copies of employee discipline letters turned over by Bemis. (Jacobsen Dep. at 44:6-24, ECF No. 99-2; Haddock Dep. at 238: 3-13, ECF No. 99-1.)

While communicating with the grievant may be a "best practice," violation of a best practice does not necessarily constitute a breach of the duty of fair representation. Most importantly here, in order to show that the Committee's actions were arbitrary for purposes of Section 301, Olson must show that the outcome of his case would have been different if Haddock had reported to him more consistently. *See Garcia,* 58 F.3d at 1176–77. Since Olson has offered no argument that increased communication would have affected the Committee's decision making or the ultimate outcome of the grievance process, the Committee's communication with Olson does not provide evidence of arbitrary action.

Ultimately, the Committee's initial decision to drop Olson's grievance is arbitrary only if no colorable argument could be made to support the union's decision at the time it was made. *Trnka*, 30 F.3d at 61. In addition to the issues discussed above, the Committee considered Olson's prior suspension for violating a TSA and his general attitude towards safety rules. Olson's prior violation was characterized by Bemis as a "serious safety violation." (ECF No. 100-13.) In Weklar's review of Olson's termination grievance at Step 3, Weklar noted that in March 2011, Olson "was nearly pulled into a moving machine because of his disregard to follow prescribed safety procedures." (*Id.*) Although the discipline was reduced, the suspension itself was not

overturned, and Bemis warned Olson that failure to follow TSAs in the future could lead to further disciplinary action, including termination. (*Id.*; Bemis' Proposed Facts ¶ 14, ECF No. 81.) Susan Searing testified that Bemis typically utilized progressive discipline, but she also noted that a strict hierarchy of discipline was not an absolute, and that discipline decisions were also based on the seriousness of the violation and other factors. (Searing Dep. at 14:4-15, ECF No. 99-4.) As for Olson's attitude, he admitted that he knowingly violated a TSA on January 5, 2012, and he attempted to justify his actions by stating that no one followed TSAs and TSAs create waste. (ECF No. 87-2.) An arbitrator might reasonably have declined to overturn the discharge decision if he or she perceived these comments to exhibit a lack of regard for Bemis' safety rules.

In sum, although Olson has raised some disputed issues of fact related to his discharge, no reasonable jury could deny that colorable arguments support the Committee's initial decision to forego arbitration. Furthermore, even if the Bargaining Committee's initial decision to drop Olson's grievance was arbitrary, that decision did not harm Olson because Local 2-148 agreed to submit his grievance to arbitration following the membership vote. *See Garcia,* 58 F.3d at 1177 ("The plaintiff must [] establish both that the union acted at least arbitrarily *and* that the plaintiff was actually harmed by the union's actions.").

### 4. The Local Union's Decision to Settle the Grievance Was Not Arbitrary

Olson contends that Local 2-148's decision to settle the grievance on May 7, 2012, rather than proceed to arbitration was arbitrary. He argues that the Committee lacked authority to settle the grievance because Haddock acted alone, and he also argues that the Committee could not possibly settle the case in a reasonable manner because apart from Haddock, the Committee members lacked experience with the arbitration process. These arguments are meritless. First,

Haddock testified that he spoke to each of the Committee members and obtained their agreement before accepting the settlement offer. Committee Co-chairman Pamela Boushley also went with Haddock to Olson's house on May 7 to inform him that the Committee was going to accept Bemis' $20,000 offer. (Haddock Decl. ¶¶ 46–47, ECF No. 86.) Although Olson points to Committee member Kyle Hipp's testimony that he does not recall voting on the issue, Hipp also testified that he was replaced on the Committee by Dan Schierl sometime in March or April 2012. (Hipp Dep. at 9:15-17, ECF No. 99-8; *Id*. at 5:2-10, ECF No. 106-2.) Olson's assertions that Haddock acted alone and that he lacked authority to speak for the Committee are not substantiated by the evidence. Second, the Committee members' lack of experience is inconsequential. As discussed above, union committee members are not held to the standards of experts or lawyers; regardless of their qualifications and experience, the only relevant question under Section 301 is whether their conduct was arbitrary, discriminatory, or in bad faith.

The Union argues that Local 2-148 acted within the wide range of reasonableness permitted to union decision making in accepting a $20,000 settlement of Olson's grievance. They contend settlement was the best option based on the merit of Olson's grievance and his apparent goals in the bargaining process. As to the merits, Haddock states that in addition to the considerations examined above, he also considered that Olson's back injury made him unavailable for work. He contends there was no indication that Olson would become healthy enough to resume work as a machine operator at Bemis, and he doubted that an arbitrator would reinstate Olson to a job that he might not be able to perform, especially given that his injury resulted from a knowing violation of a TSA. (Haddock Decl. ¶ 44, ECF No. 86.) The Union adds that because of Olson's injury, $20,000 was objectively more than Olson was likely to recover at arbitration. Even if Olson was able to convince

the arbitrator that termination was unjust, the arbitrator may still have imposed a lengthy suspension based on Olson's prior safety violation and attitude. They also argue that an arbitrator would have declined to award back pay for time periods in which his injury prevented him from working and for time periods in which he failed to mitigate damages by seeking other employment.

The purpose of back pay in wrongful discharge claims is "to make whole the injured party by placing that individual in the position he or she would have been in but for the [wrongful discharge]." *Miller v. Raytheon Co.*, 716 F.3d 138, 146 (5th Cir. 2013) (addressing back pay claim under ADEA). Consequently, courts generally decline to award back pay if the discharged employee was unable or unwilling to work during the relevant period. *See, e.g.*, *Rivera v. NIBCO, Inc.*, 384 F.3d 822, 832–33 (9th Cir. 2004) (explaining that under Title VII, a back pay award is precluded if the discharged employee was physically unable to work or voluntary removed himself from the labor market); *McDaniel Ford, Inc. v. NLRB*, 12 F. App'x 75, 77 (2d Cir. 2001) (affirming back pay award in NLRA claim after finding that wrongfully discharged employee was able to work despite evidence of illness). Since Olson already had one suspension on his record for violating a TSA, it was not irrational for the Committee to consider that even if an arbitrator had reinstated Olson, the arbitrator might have imposed a lengthy unpaid suspension. In addition, it was not irrational for the Committee to consider that Olson may or may not have been physically healthy enough to resume work at Bemis or obtain employment elsewhere. Olson's injury on January 5 was serious enough to require hospitalization, and the Committee did not yet have the benefit of Dr. Karr's May 29 opinion when it settled Olson's grievance on May 7. Thus, given the risk that Olson would recover nothing or only a small amount of back pay, a $20,000 settlement cannot be viewed as an objectively unreasonable amount. *Cf. Matthews*, 495 F.3d at 442 (holding that union's

decision to settle for two days of back pay was reasonable considering that an arbitrator could only have awarded a maximum of eight days of back pay).

The Union also contends that settlement was the most reasonable option based on the Bargaining Committee's interactions with Olson during the negotiation process. Haddock states that when he initially approached Olson with an offer of either reinstatement or $10,000, Olson's response was, "boy, if it was twenty," suggesting that he would accept a cash settlement of $20,000. He claims that Olson did not either object to, or ask him to renegotiate any of the terms of reinstatement. (Haddock Decl. ¶ 40, ECF No. 86.) Haddock then procured a $20,000 offer from Bemis. (*Id.* ¶ 41.) Although Olson denies insinuating to Haddock that he was only interested in a cash settlement, his counteroffer of $37,500 did not include reinstatement. (Olson Decl. ¶ 40, ECF No. 100; ECF No. 99-15 at 4.) Since Olson was only asking for a cash settlement, it was not irrational for the Committee to accept a settlement that did not include reinstatement.

It is of course possible that an arbitrator could have ruled in Olson's favor or at least reduced his discipline to a suspension. For example, an arbitrator might have believed Olson's version of events or decided that termination was too severe a punishment in light of Olson's past performance at Bemis. Olson had worked at the plant since 2004, and in his December 2010 and December 2011 performance reviews, his supervisor found him to be satisfactory in safety. (*See* ECF Nos. 100-1 & 100-2.) But while it is possible that an arbitrator could have ruled in Olson's favor or at least reduced his discipline to a suspension, the Committee was justifiably skeptical. The post-incident reports and interviews offered minimal support for Olson's version of events, Olson had already been suspended once for a serious safety violation, Olson had been warned that disregarding safety rules could result in termination, and an arbitrator could have interpreted Olson's statements as

demonstrating a lack of regard for Bemis' safety rules. At the very least, the arbitrator would have been required to weigh Olson's credibility against the credibility of other witnesses. Because Olson had injured himself, it was also not clear that reinstatement or back pay would be available remedies. In light of this evidence, no reasonable jury could find that the Committee's decision to settle Olson's grievance for $20,000 was arbitrary. *See Matthews*, 495 F.3d at 442 (holding that union's decision to settle grievance short of arbitration was reasonable because grievant had a past record of misconduct, had been warned that future misconduct could result in termination, had made comments that could be perceived as threatening, and had lied during the investigation).

### B. Bad Faith

Olson also asserts that the Committee's handling of his grievance demonstrates bad faith. In reviewing a bad faith claim, the court conducts a subjective inquiry into the mind of the Union to determine whether it acted out of an improper motive. *Yeftich v. Navistar*, 722 F.3d 911, 917 (7th Cir. 2013). The plaintiff bears the burden of showing "substantial evidence of fraud, deceitful action or dishonest conduct." *Humphrey v. Moore*, 375 U.S. 335, 348 (1964). For Olson to survive summary judgment, he must "identify conduct by Union officials that would support a reasonable inference of bad faith." *Konen v. Int'l Bhd. of Teamsters*, 255 F.3d 402, 408 (7th Cir. 2001).

Olson first argues that the Committee's lack of communication with him as it processed his grievance demonstrates bad faith. He notes that Haddock informed him about the opportunity to present his claim at the membership meeting on March 20, only one day before the meeting. This does not provide evidence of bad faith, however, since Haddock's discussions with the other Committee members lasted until approximately March 19. (Haddock Decl. ¶ 28, ECF No. 86.) As noted above, the CBA did not require the Committee to make a decision within ten days, so this

decision was not tardy. Olson also points to the fact that Haddock's letters contained erroneous dates. This too does not constitute evidence that Haddock was acting with an improper motive. The letter Haddock handed to Olson on March 20 contained the proper date of the meeting in handwriting (Wednesday, March 21), and the erroneous date was crossed out. (ECF No. 86-6; Haddock Decl. ¶ 32, ECF No. 86.) There is no reason to think that this was confusing to Olson, especially since Local 2-148 meetings were held on the first and third Wednesday of every month. (Haddock Decl. ¶ 31, ECF No. 86.) The fact that Olson's separate letter to Attorney Culp incorrectly identified the meeting date as Thursday, March 22, may have been confusing, but Haddock also gave Attorney Culp a copy of the letter he gave to Olson. (*Id.* ¶ 33.) If Attorney Culp needed further clarification about the meeting date, he could have asked Olson, his client. Olson's assertion that Haddock placed a communication roadblock in his attorney's way when Attorney Culp attempted to clarify the date of the meeting is also unfounded, as Olson does not cite evidence that Attorney Culp attempted to contact Haddock after receiving the letter with the incorrect date.

Olson also claims that Haddock's actions at the March 21 meeting provide evidence of bad faith. Olson asserts he "was informed that Mr. Haddock was probably trying to mislead [him] and prevent [him] from having a voice to plead [his] case." (Olson Decl. ¶ 35, ECF No. 100.) This statement is not admissible evidence for purposes of summary judgment. *See* Fed. R. Civ. P. 56(c)(4). Olson's affidavit does not identify the source of the information or the factual basis for the source's opinion. Furthermore, even if the statement had included this necessary information, it would likely constitute hearsay under Fed. R. Evid. 801 unless the source submitted a separate affidavit. Olson also claims that when he arrived at the meeting, Haddock had a "surprised look on his face" and then Haddock and union officer Rod Dietzen "retreated to the back room and returned

a short while later." (Olson Decl. ¶ 35, ECF No. 100.) Olson claims this evidence supports his theory that the Committee did not expect him to attend the meeting. These statements carry no weight at summary judgment because Haddock correctly informed Olson that the meeting was on March 21; Haddock therefore had no reason to be surprised that Olson attended. In addition, Haddock states that if he was in the back room, it was likely to participate in the Executive Committee Meeting. (Haddock Supp. Decl. ¶ 7, ECF No. 105.) Regardless of the reason Haddock and Dietzen went to the back room, it is undisputed that when they returned, parliamentary proceedings were practiced and Olson was granted the opportunity to plead his case. (Olson Decl. ¶ 36, ECF No. 86.)

The Union's failure to keep Olson's attorney informed as to the status of his grievance also does not demonstrate bad faith. Haddock sent a letter to Attorney Culp on March 21 advising him to communicate exclusively with International Union attorney Emma Reborn instead of the Bargaining Committee. (ECF No. 99-12.) Olson also contends that the Union failed to communicate with Culp between March 21 and May 7 and did not include him in the settlement discussions. Under federal labor law, unions may limit the role of outside attorneys in the grievance process. *Garcia*, 58 F.3d at 1179–80 (observing that a union's "decision to disallow the presence of an independently-retained attorney in a particular case is not, standing alone, enough to show that the union acted arbitrarily. It is the union's prerogative to make such decisions in the grievance process to protect the interests of the union as well as the employee."). Thus, the Union, as owners of Olson's grievance, had no duty to communicate with Attorney Culp or involve him in any pre-arbitration activities.

Finally, Olson does not recount any previous conflicts with Haddock or the Bargaining Committee. (Olson Dep. at 100:2-6, ECF No. 87-3.) In fact, the Bargaining Committee had successfully helped Olson recover lost pay after his March 2011 suspension. *See Crider*, 130 F.3d 1238 (holding that union's prior successful representation of a grievant constituted evidence that the union bore no ill will towards the grievant). In short, the record is bereft of evidence from which a reasonable jury could infer that the Union acted in bad faith. Olson has therefore failed to satisfy his burden at summary judgment as to his bad faith claim.

### IV. Conclusion

For the reasons stated above, Olson has failed to offer evidence from which a reasonable jury could find that the Union breached its duty of fair representation. The sentiment underlying much of Olson's argument is that Local 2-148 unfairly deprived him of the opportunity to present his evidence to a neutral arbiter. The notion that everyone is entitled to his day in court is an appealing one, but as explained above, federal labor law grants unions significant authority over the employee grievance process. Union employees reap the benefits of collective action and generally enjoy greater employment protections than at-will employees, but in exchange, they must submit to have their interests represented by the union. Here, both federal law and the CBA under which Olson worked did not mandate that his grievance proceed to arbitration. Olson disagreed with the Union's handling of his grievance, but this in itself is not a breach of the Union's duty of fair representation. *See Garcia*, 58 F.3d at 1176 (*"The union is [] entitled to enjoy a somewhat different perspective than the individual employee it represents in a grievance matter."*). A union breaches its duty only if its actions are arbitrary, discriminatory, or in bad faith, and Olson has failed to offer evidence

from which a reasonable jury could find that Local 2-148's actions met this standard. Accordingly, Olson's hybrid Section 301 claim fails and the court need not analyze whether Bemis breached the CBA. *DelCostello*, 462 U.S. at 164–65. The court also need not address whether the International Union could be liable for acting as Local 2-148's agent. For the foregoing reasons, Defendants' motions for summary judgment (ECF Nos. 79 & 83) are granted and this case will be dismissed. The Clerk is directed to enter judgment dismissing Olson's claims against both Bemis and the Union with prejudice.

      **SO ORDERED** this   17th   day of April, 2014.

                   s/ William C. Griesbach
                  William C. Griesbach, Chief Judge
                  United States District Court